George Nelson, Respondent, *v.* Lake Shore and Michigan Southern Railway Company, Appellant.

Fourth Department, November 20, 1918

**Railroads — negligence — injury to pedestrian struck by train at street crossing — contributory negligence — stare decisis — effect of prior decision by Court of Appeals in action for death of plaintiff's companion which occurred at time of plaintiff's injury — crossing railroad tracks after gates are closed — effect of plaintiff's voluntary attempt to rescue his companion.**

In an action by the plaintiff to recover for personal injuries sustained by him when defendant's locomotive drawing a passenger train collided with him at a city grade crossing, the evidence showed that after the gates at the crossing were lowered a freight train from the west passed; that at the same time a west-bound passenger train was approaching from the east, and that the plaintiff, a patrolman, and his companion, a night watchman on the police force, went upon the crossing after the gates were down and the east-bound freight train was passing over the crossing and reached the point of collision just as the freight train cleared the crossing, and that the plaintiff and his companion were very familiar with the crossing, the location of all the tracks and with the passing of night trains. The Court of Appeals in an action by the administratrix of plaintiff's companion, who was accidentally killed, has affirmed a judgment dismissing the complaint.

*Held*, on all the evidence, that upon the doctrine of *stare decisis* the decision of the Court of Appeals in the case of the plaintiff's companion requires a reversal of the judgment in favor of the plaintiff and a dismissal of the complaint.

If the plaintiff and his companion had gone upon the crossing after the gates were down and the same fate had befallen them, the plaintiff could not recover. In that case no negligence on the part of the defendant could be predicated upon the speed of the train or the absence of signals of its approach by whistle, bell or headlight. Whatever effort the plaintiff might have made to rescue his companion would not have furnished the basis of a cause of action against the defendant for two reasons: *First*, because the defendant would not have been guilty of negligence, and *second*, because the plaintiff would have been guilty of contributory negligence as a matter of law.

The shutting down of the gates when the plaintiff and his companion were fifteen or twenty feet distant therefrom over the crossing was notice to them that the defendant required the exclusive use of said crossing, and their attempt to proceed, with knowledge of the passing of trains, constituted contributory negligence.

Since with the gates down under the circumstances the defendant was not
   guilty of any actionable negligence, the plaintiff cannot create a cause
   of action even if the evidence tends to show that he voluntarily risked
   his life to save his companion.

LAMBERT, J., dissented.

APPEAL by the defendant, Lake Shore and Michigan Southern
Railway Company, from a judgment of the Supreme Court in
favor of the plaintiff, entered in the office of the clerk of the
county of Chautauqua on the 23d day of February, 1918,
upon the verdict of a jury for $2,600, and also from an order
entered in said clerk's office on the same day denying defend-
ant's motion for a new trial made upon the minutes.

. *Hoyt & Spratt* [*R. C. Vaughan* of counsel], for the appellant.

*Nelson J. Palmer*, for the respondent.

DE ANGELIS, J.:

The plaintiff had a judgment for damages for personal
injuries sustained by him when defendant's locomotive,
drawing a passenger train, collided with him at a city grade
crossing owing to the engineer's alleged negligent management
of the locomotive.   The grounds of defense were absence of
negligence in the management of the locomotive and failure
of plaintiff to show freedom from contributory negligence.

One Hatch, who accompanied the plaintiff upon the crossing,
was killed.   An action brought by Hatch's widow as adminis-
tratrix of his estate was tried three times.   The first and
second trials resulted in verdicts for the plaintiff.   Upon
appeals to this court judgments upon the verdicts were reversed
and new trials ordered.   (156 App. Div. 394; 159 id. 596.)
The third trial resulted in a nonsuit at the close of all the
evidence.   On appeal this court affirmed the judgment of
nonsuit (167 App. Div. 958) and the judgment entered upon
the decision was affirmed in the Court of Appeals, without
opinion.   (219 N. Y. 650.)

The evidence upon the trial of this action does not differ
materially from the evidence given upon the several trials
of the *Hatch* case and, therefore, the question for our determina-
tion is whether or not upon the doctrine of *stare decisis* our
decision in the *Hatch* case requires us to reverse the judgment
under review and dismiss the complaint.   We cannot know

whether or not the Court of Appeals affirmed our judgment upon the ground that the defendant was not shown guilty of actionable negligence or upon the ground that Hatch was guilty of contributory negligence. If we should hold that the defendant was not guilty of actionable negligence we should of course dismiss the complaint. If, on the other hand, we should hold, as the trial court has held, that the question of the defendant's negligence was for the jury, we would be called upon to decide whether or not the plaintiff's case can be fairly distinguished from the *Hatch* case, in that the plaintiff's conduct in the instant preceding the collision was such as to have justified the trial court in submitting to the jury the question of his contributory negligence upon the theory that the jury might have found that he voluntarily placed himself in a position of danger for the purpose of saving the life of Hatch and that in so doing he was neither rash nor reckless.

Somewhat extended reference to the evidence seems to me to be necessary.

Lion street is one of the public streets of the city of Dunkirk and runs northerly and southerly. The defendant's tracks, running easterly and westerly, cross Lion street at right angles at grade. The crossing is protected by gates. The northerly gate is in two parts, the base of one being on the east side and that of the other on the west side of the street. The southerly gate has but one arm whose base is on the east side of the street. Five tracks cross the street. Although the evidence is undisputed that these tracks are of the standard gauge, that is, that the distance between the rails of each track is four feet eight and one-half inches, the plaintiff's testimony makes the rails of each track five feet apart from center to center, which may not be far out of the way. The first track on the north is one of the defendant's sidings and its northerly rail is about five feet from the northerly gate. I am adopting the measurements of the plaintiff which differ slightly from those of the defendant. The next track southerly is an Erie siding and its northerly rail is about six feet from the southerly rail of the siding last mentioned. The next track southerly is the defendant's west-bound track and its northerly rail is about eleven and one-half feet from the southerly rail of the siding last mentioned. The next track southerly is the

defendant's east-bound track and its northerly rail is about eight feet from the southerly rail of the defendant's west-bound track.  The next track southerly, that is, the most southerly track, is an Erie track and its northerly rail is about seventeen feet southerly from the southerly rail of the defendant's east-bound track.

On each side of the crossing there is a plank sidewalk. The crossing gates are operated by a man in an elevated circular structure located just south of the defendant's east-bound track and just at the east edge of the east sidewalk.

The defendant's tracks extend easterly from the edge of the easterly sidewalk on Lion street, straight, to a point nine hundred and seventy feet therefrom at which point they begin to curve to the north.  The defendant's signal tower is one thousand three hundred and ninety-five feet east of the Lion street crossing, is a two-story building and is about twelve by twenty feet.  It is about nine feet north of the north rail of the defendant's west-bound track.  To a person standing in the middle of the west-bound track on the Lion street crossing a locomotive coming from the east would be first visible one thousand six hundred and ninety feet therefrom.  There is a semaphore just east of the crossing and a little over seven feet north of the west-bound track.  There is also a water pipe about six and a half feet north of the west-bound track and about seventy-eight feet east of the crossing.  It appears that there is a great number of switch lights east of the crossing down through the yard.

On the night of Saturday, April 6, 1912, more accurately at twenty-five minutes after one o'clock, the 7th day of April, 1912, the plaintiff and Hatch were collided with by the defendant's locomotive drawing the second section of the passenger train known as the Twentieth Century Limited, and moving westerly on the defendant's west-bound track. Hatch was instantly killed and the plaintiff received the injuries for which he has recovered the judgment under review.

The plaintiff testified in substance that he and Hatch approached the crossing on Lion street from the north; that they were walking on the east sidewalk and had gotten fifteen

or twenty feet south of the northerly gate when the gates were closed down; that at that time a freight train moving easterly on the defendant's east-bound track was about sixty feet west of the crossing (it must be borne in mind that the west-bound track on which the collision occurred was between these pedestrians and the east-bound track which was occupied by the freight train); that he and Hatch stopped and waited till this freight train was about to clear the crossing when they started on their way again over the crossing, walking slowly; that the plaintiff was on the west side of the sidewalk and Hatch was on the east side; that when the plaintiff reached a point nine feet north of the north rail of the west-bound track and Hatch was about five feet north of such north rail, they stopped again; that just as the caboose of the freight train was passing off the crossing they started forward again and when Hatch was stepping upon the west-bound track — was practically upon the west-bound track — and the plaintiff was four or five feet from it, he saw the Twentieth Century Limited coming towards them on that track and he reached to save Hatch — " reached out my left hand to grab him; " that just then the collision occurred; that the plaintiff was thrown about thirty feet over the crossing and Hatch was carried to the other side of the crossing and killed.   The plaintiff testified further in substance that as he approached the west-bound track he looked along the tracks both easterly and westerly repeatedly and that he neither saw nor heard the Twentieth Century Limited till the collision was inevitable.

This is, I think, a fair statement of the plaintiff's testimony, although it is possible that the jury might have taken a slightly different view of it, in one particular.  As I have stated it, he testified: " When Hatch was stepping upon the west-bound track — was practically upon the west-bound track — and the plaintiff was four or five feet from it, he saw the Twentieth Century Limited coming towards them on that track and he reached to save Hatch — ' reached out my left hand to grab him; ' that just then the collision occurred."   There is a suggestion in the plaintiff's testimony that as he stood at a point nine feet from the west-bound track, Hatch having stopped and stood five feet nearer the track, Hatch started forward before the plaintiff did and when the plaintiff saw the train

coming and Hatch's peril, he then made a jump to save him. There is no substantial basis for the suggestion. The counsel for the plaintiff in his statement of the facts in his brief makes no such claim. This suggestion is in irreconcilable conflict with all of the rest of the plaintiff's testimony and the circumstances of the case. But the jury might have found that as the plaintiff, moving forward as Hatch moved forward, reached a point five feet from the track and Hatch was practically on the track, the plaintiff then saw the train coming and took a step in advance when he " reached out my [his] left hand to grab " Hatch.

The overhang of the locomotive, that is, the projection beyond the track on each side, is twenty-six inches, that is, the cylinder and pilot beam extend beyond the track twenty-six inches.

The plaintiff had been on the police force of Dunkirk for fourteen years. He was a patrolman and this crossing was on his beat. Hatch was a special officer and was a night watchman in the business section of the city in the immediate locality of the crossing. Both of these men were very familiar with the crossing, the location of all the tracks, and the location of the defendant's two main tracks. They were very familiar with the passing of the night trains on the defendant's tracks.

The evidence tending to show that the plaintiff and Hatch were already on the crossing south of the north gate when the gates went down is not convincing. The plaintiff testified to that condition of things and one Bartos corroborated him. It appears that the plaintiff, Hatch, Bartos and one Allen were in the vicinity of the crossing a short time before the accident. The plaintiff testified that when he and Hatch had reached a point fifteen or twenty feet south of the north gate both the north and south gates went down. Bartos testified that he and Allen were approaching the north gate when it " fell " down right in front of them. Allen, called as a witness by the defendant, testified that he was with Bartos and saw the plaintiff on Third street, but that he did not see Hatch at all; that neither he nor Bartos approached the north gate; that neither he nor Bartos saw the north gate go down; and that neither he nor Bartos saw either the plaintiff or Hatch on the crossing.

The evidence tending to show that the Twentieth Century Limited passed the crossing at excessive speed, that the headlight was burning dimly if at all, that the whistle on the locomotive was not blown, and that the bell on the locomotive was not ringing, was not convincing. The plaintiff did not undertake to testify to the speed of the train. Bohn, the hotel man, Knoll, the employee of the Erie Railroad Company, and Bartos testified upon this subject. Bohn estimated the speed of the train at fifty or sixty miles an hour, Knoll at fifty miles an hour, and Bartos at fifty or sixty miles an hour. Bohn was standing at a closed window at some distance away from the train. Bartos did not see the train at all if the testimony of Allen was truthful. Knoll was 1,295 feet east of the crossing when the train passed him, and, although he testified that the speed of the train did not change until it passed out of his sight, the evidence that the train did move more slowly at the crossing partakes of more probability than his estimate of the speed of the train moving away from him and 1,295 feet beyond him. He also testified that he was not paying any particular attention to the train. Redhead, the engineer, and Soules, the fireman, testified that the train was running from twenty to twenty-five miles an hour as it passed over the crossing. They also testified that they knew the regulation of the city council prohibiting trains from running in excess of twenty-five miles an hour. Caldwell, the towerman and telegraph operator, stationed in the tower 1,395 feet east of the crossing, testified that as the train passed him it was running about twenty-five or thirty miles an hour. Cassap, the engineer on the switching locomotive, who at the time of the passing of the Twentieth Century Limited was on a switch about 2,335 feet east of the crossing, taking the measurement of the defendant, or 2,900 feet, taking the measurement of the plaintiff, testified that as the train passed him it was running forty miles an hour. He testified that the train was decreasing in speed and that he saw the brakes had been applied because the sparks were coming from the brake shoes. The plaintiff first testified that he did not see the headlight and later that it was burning dimly. No other evidence upon that subject was produced by the plaintiff. The evidence produced by the defendant of its carefully

devised system to provide against the fallibility of human agencies in the operation of its trains, and the testimony of McGuire, the chief train dispatcher, of Caldwell, the towerman and telegraph operator at Dunkirk, of Brown, the towerman and telegraph operator at Westfield, the station next west of Dunkirk, and of Creden, the towerman and telegraph operator at Painesville, a station further west, make a strong showing that the headlight on the locomotive was in proper condition. Adding to this the testimony of the engineer and fireman on the locomotive makes the defendant's claim that the headlight was in proper condition very convincing. The plaintiff testified that he did not hear the bell ring or the whistle blow. This is not very forceful in view of his testimony in response to these questions: " Q. Did you see this train?   A. No, sir.   Q. And about how far from you was it when you first saw it?   A. Oh, it was right onto us.   Q. Right onto you?   A. I don't know where it come from. It looked as though it come from the ground." This testimony was given in response to questions put to him by his counsel on direct examination. Bohn, Knoll and Bartos testified that they did not hear any whistle or bell but that they were not paying any particular attention to the subject. Bohn would not swear that the whistle was not blown or the bell rung. The engineer and the fireman both testified that the bell was rung continuously and that the whistle was blown. They testified that the bell was an automatic ringing bell. One of the latest restatements of the rule on the subject by the Court of Appeals will be found in *Foley* v. *N. Y. C. & H. R. R. R. Co.* (197 N. Y. 430, 433).

The learned trial judge permitted the jury to pass upon the question whether or not the plaintiff might have confused the headlight of the locomotive with switch lights east of the crossing. The only evidence with reference to the presence of switch lights was given by the plaintiff's surveyor but those switch lights were down through the yards so far east of the crossing as not possibly to have been confused with the headlight of the locomotive. There was the supporting post of a semaphore just east of the crossing and a water pipe further east and about seventy-eight feet from the crossing. These might have obstructed the view east slightly but not appreciably

upon the plaintiff's own showing. He finally admitted that they did not obstruct his view. There was nothing in his testimony to indicate that the switch lights confused him as to the approach of the train.

I entertain the view that the plaintiff and Hatch went upon this crossing after the gates were down and the east-bound freight train was passing over the crossing, and reached the point of collision just as the freight train cleared the crossing. I think they saw the freight train passing over the crossing, assumed that the gates had gone down for that train, assumed that the noise they must have heard was that of the freight train, and, heedless of the approach of the passenger train, walked into the peril of its pathway. If it were to be conceded that the question of the defendant's negligence and the question of the plaintiff's freedom from contributory negligence were for the jury, their verdict is against the weight of the evidence.

We are now brought to a consideration of the stability of the judgment under review, assuming the view of the evidence most favorable to the plaintiff irrespective of its weight.

It seems to be entirely clear that if the plaintiff and Hatch had gone upon the crossing after the gates were down, and the same fate had befallen them, the plaintiff could not recover. The barring of the way by the gates was notice to them that the crossing was to be used exclusively by the railroad. In that case no negligence on the part of the defendant could be predicated upon the speed of the train or the absence of signals of its approach by whistle, bell or headlight. Whatever effort the plaintiff might have made to rescue his companion would not have furnished the basis of a cause of action against the defendant for two reasons, *first,* because the defendant would not have been guilty of negligence, and, *second,* because the plaintiff would have been guilty of negligence, as matter of law. It is true that some circumstance might take from the closed gates such potency of warning, as, for example, the circumstance shown in the *Pruey* case (*Pruey v. N. Y. C. & H. R. R. R. Co.,* 41 App. Div. 158; affd., 166 N. Y. 616), to wit, that the gates were left down for considerable periods in the night and early morning irrespective of the

approach or passage of trains.   Assuming, as we must, that the plaintiff and Hatch were already fifteen or twenty feet south of the north gate when the gates went down, what effect did the shutting down of the gates have upon what should have been their conduct?   I think the shutting down of the gates was notice to them that the defendant required the exclusive use of the crossing.   If, acting upon such notice, they had attempted to get off the crossing and they had in their effort to escape encountered danger from the operation of the defendant's railroad, there would have been room for another view.   But these men were familiar with this crossing. They knew when the gates went down that before them, at a distance of fifteen or twenty feet, was the west-bound track of the defendant and that the east-bound track which was about to be occupied by the freight train was the next track south. They knew that while that freight train was occupying the east-bound track a passenger train might be coming west on the west-bound track.   In other words, they were in a place of safety and they were notified that these two main tracks south of them, one or both, were to be occupied.   The Court of Appeals has held that because Hatch with such notice proceeded south to be collided with and killed by the west-bound passenger train, his administratrix could not recover for his death.   This plaintiff has been permitted to recover, although he went south with Hatch from a place of safety to a place of danger because he has testified when it was too late he made a vain attempt to rescue Hatch.   The plaintiff with Hatch courted the danger, and, with no word to admonish Hatch of his danger until it was too late, made the vain effort to rescue him.   (See *White* v. *N. Y. C. & H. R. R. R. Co.*, 68 App. Div. 561, 565; affd., 174 N. Y. 543.)   We do not think that the plaintiff's testimony bought him within the protection of the rule laid down in *Eckert* v. *Long Island R. R. Co.* (43 N. Y. 503); *Gibney* v. *State of New York* (137 id. 1); *Matter of Waters* v. *Taylor Co.* (218 id. 248).

With the gates down in the circumstances, however, the defendant was not guilty of any actionable negligence.   That being so, the plaintiff could not create a cause of action against the defendant even if the evidence presented the case of one who voluntarily risked his life to save another.

Fourth Department, November, 1918.          [Vol. 185.

I think for the reasons given the judgment and order appealed from should be reversed and the complaint dismissed.

All concurred, except LAMBERT, J., who dissented and voted for affirmance.

Judgment and order reversed, with costs, and, this court having determined that the trial court should have granted the defendant's motion for the direction of a verdict, the complaint is dismissed upon the merits, with costs.